UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>NATHANIEL B. GRIFFIN,<br>Defendant. | 1:23-CR-10032-1-CBK<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AND ORDER ON MOTION TO SUPPRESS |
|---|---|

Defendant moved to suppress statements he made to F.B.I. Special Agent Liam Hinkes following defendant's arrest on September 25, 2023, during defendant's transport from McLaughlin to Faulkton, South Dakota. The motion came on for a hearing before Magistrate Judge Mark A. Moreno. Magistrate Moreno issued a bench decision and a report and recommendation wherein he recommended that the motion to suppress be denied. Defendant filed objections to the report and recommendation. I have conducted a *de novo* review of the record as required by 28 U.S.C. § 636(b)(1).

## DECISION

An indictment issued charging defendant and others with having committed burglary and assault with a dangerous weapon on July 5, 2023. Arrest warrants were issued and defendant was arrested on September 25, 2023 in McLaughlin, South Dakota. He was placed, in shackles, in the caged section of the back seat of a Ford F-150 four door pickup truck. Defendant was transported by Agent Hinkes to the Faulk County Jail where he was to be held pending his initial appearance before the magistrate scheduled for the following day.

After the defendant was secured in the vehicle, an audio recording device was activated and Agent Hinkes advised defendant of his rights. The transport began at approximately 4:10 p.m. and lasted nearly two hours.

Immediately following the advisement of rights, Agent Hinkes asked the defendant "are you willing to answer questions without a lawyer pres-" and was interrupted by defendant's response "Yes, sir." Agent Hinkes proceeded to explain that

defendant was arrested on a federal warrant for burglary and assault, was going to go to jail that night, and would probably have an appearance before a judge the following day. Defendant repeatedly expressed his concerns that his case was dismissed in tribal court, that he was scared and nervous, and that he did not commit a burglary.

Defendant repeatedly inquired about getting released and Agent Hinkes advised that a judge would make that decision at the initial appearance. Defendant became increasingly nervous and upset about being charged with burglary, whether he was going to be released, and whether he would go to prison. Agent Hinkes was careful to respond to each concern by telling defendant all those matters were up to the judge.

Twenty-nine minutes into the ride to Faulkton, defendant asked "I get to speak to a lawyer, too right?" Agent Hinkes responded that "one of the public defenders will see you most likely tomorrow before your initial appearance . . . it just depends on their schedule and how busy they are, but typically that's how it works . . . they'll speak with you tomorrow and they you'll go for your initial appearance with the judge."

Once Agent Hinkes received a telephone call with confirmation of the time and place of defendant's hearing, he relayed that information to the defendant. Upon further questioning by the defendant, Agent Hinkes told the defendant that you'll spend tonight in Faultk County . . And then then tomorrow, we'll get you to Pierre, you'll see the judge . . . You'll talk to your lawyer . . . The lawyer will be able to explain more what's gonna happen with the, with the court stuff –." Defendant interrupted Agent Hinkes with further questioning about whether his situation was a "really bad thing" and expressed his concern about having never been in in a situation involving federal matters.

Fifty minutes into the ride, defendant began making moaning, coughing, and gagging noises. In response to these sounds, Agent Hinkes inquired several times "You doin' alright, Nathaniel?," "What's going on?, Talk to me." Defendant responded that he was trying not to throw up and that he was okay.

At nearly one hour into the ride, defendant and Agent Hinkes had the following exchange:

Griffin: Hey bro, can they give me som'in for suicidal?

2

Hinkes: Huh?

Griffin: Do you think they can give me a medicine for, like, suicidal [inaudible]

Hinkes: You're feelin', maybe feelin' suicidal?

Griffin: Yeah, I don't feel very good.

Hinkes: Yeah, well let them know when we get there and stuff, and well see what they can do, okay?

Griffin: Thank you, man.

Hinkes: Do you wanna, do you need someone to talk to?

Griffin: Yeah, bro, I've never been through this situation.

Hinkes: Okay, what do you, well, you could, **I'm here, so you can talk to me, you don't have to talk about anything about why, why you're here, but you can talk to me about everything else.**

Griffin: I understand. I'm fuckin' scared man, I feel like, like [inaudible].

Hinkes: Say that again.

Griffin: Yeah, I'm scared and nervous, I've never been through this situation, but I'm not gonna cry or nothin', ya know what I mean, I just, my heart hurts.

Hinkes: That's, no that's understandable, I know it's, it's kind of a crazy situation, but, well make sure you get through it.

Griffin: Yeah, I understand.

Hinkes: Ya know, its, and

Griffin: I feel like I'm fuckin'

Hinkes: and once to, once tomorrow comes well have, youll have more information about-

Griffin: I know.

Hinkes: what's gonna happen with the situation and stuff.

Griffin: I just-

Hinkes: But tonight-

Griffin: I just, I just got outta jail for this and then-

3

> Hinkes: Uh huh.
>
> Griffin: think, thinking I'm a failure, n' this happens to me.
>
> Hinkes: Yeah.
>
> Griffin: I did what I did, but I didn't do the stuff I did. [Inaudible] none of that situation. Unless the dudes that I was with snitched on me and said some shit about whatever, whatever. Fucked, fucked up man, I didn't do this shit. I know it's gonna take a while to go through this situation. [Inaudible] I can do the time and whatnot, I just, I didn't do this.
>
> Griffin: [Inaudible]
>
> Griffin: Is prison better than jail?
>
> Hinkes: What was that?
>
> Griffin: Is prison better than jail? Not better, but.
>
> Hinkes: I, I honestly couldn't tell ya. I don't know enough about the difference, so.
>
> Griffin: That's a stupid question to ask, bro. [Laughs]
>
> Hinkes: If I had, if I had the answer, I would tell ya.
>
> Griffin: Yeah, yeah, but that's a stupid question for me to ask you that. Yeah. [Inaudible].

Ten minutes later the following exchange occurred:

> Griffin: You got the paperwork on my arrest warrant and stuff?
>
> Hinkes: 1 do not have the paperwork for your arrest warrant. Why, what do you wanna know about it?
>
> Griffin: Okay. Okay. Yeah, 1 [inaudible] nervous as hell.
>
> Hinkes: It's understandable, man. It's okay to be nervous. Just-
>
> Griffin: [Inaudible]
>
> Hinkes: The process will go and you'll get to, you'll get to talk to your lawyer about it tomorrow.

Defendant continued to mumble to himself and, upon inquiry from Agent Hinkes, would respond that he was nervous. Defendant repeatedly and frequently

4

asked how much longer until they arrived at the jail. One and one-half hours into the ride, the following exchange occurred:

> Griffin: [Inaudible] Is this a bad, bad crime? [Inaudible]
>
> Hinkes: What's up?
>
> Griffin: This crime I just did, or whatever, is this a bad?
>
> Hinkes: So, what you, what you've been arrested for?
>
> Griffin: Yeah, is it a bad, bad, bad, bad crime, or?
>
> Hinkes: Well, you got, you got picked up for assault and burglary, so it's not there, they're not great crimes, like it's not, ya know, I mean, not that any crime's great, but ya know, ya didn't, you didn't, you didn't do anything like that.

During the suppression hearing, Agent Hinkes testified that at that point in the transcript there was an error – before the final phrase Hinkes stated "you didn't kill anybody."

> Griffin: Okay.
>
> Hinkes: But, ya know, you're getting picked up for assault
>
> Griffin: Yeah, I understand.
>
> Hinkes: and burglary, so.
>
> Griffin: Assault and burglary?
>
> Hinkes: So, it's not, ya know-
>
> Griffin: Thank you for being honest with me, man.
>
> Hinkes: Yeah. It's, it's.
>
> Griffin: I mean, how much, how, what do you think the time is on this, like years, or?
>
> Hinkes: I, I honestly man, without, without lookin' at the actual like codified laws, 1 can't, I couldn't, I couldn't give you a good guess.
>
> Griffin: Yeah.
>
> Hinkes: But a lot of it, ya know, a lot of it depends on, depends on your past criminal history-
>
> Griffin: Okay.

5

Hinkes: which, if I remember, yours is pretty clean. Ya don't have, ya know, you don't have a lot goin' on. And I understand, **and again, we, we don't need to discuss the details of what happened.**

Griffin: Yeah, I understand.

Hinkes: Unless you want to.

Griffin: Yeah, I understand.

Hinkes: But, you know, I understand this is probably, as you said, you haven't been in this situation before-

Griffin: [Inaudible]

Hinkes: So-

Griffin: I don't have a criminal record.

The discussions that occurred up to this time were clearly initiated by defendant. Agent Hinkes repeatedly told defendant they did not have to discuss the offense conduct, even though defendant stated at the beginning that he was willing to answer questions without a lawyer. Defendant continued to initiate conversation about the offenses for which he was arrested.

Griffin: Can I ask another question? Did you guys catch the other two?

Hinkes: What's up?

Griffin: Did you guys get the other two?

Hinkes: So, we haven't, we haven't actually picked up the other two yet. So, since we, we both know who they are-

Griffin: Yeah.

Hinkes: We, I don't, we don't know where they are right now, but we're, ya know, warrants are out and we're lookin' for 'em.

Griffin: [Inaudible]

Hinkes: If you happen to know where they are-

Griffin: [Inaudible] Ya know what I mean?

Hinkes: What was that?

Griffin: I was just followin' their, their leads, ya know what 1 mean?

Hinkes: Yeah.

Griffin: This problem I have. But it still, it makes me a bad person, 'cause I was with them, ya understand what I'm sayin'?

Hinkes: No, well, if, so again, let's, I wanna make sure you understand the-

Griffin: 'Kay.

Hinkes: completely.

Griffin: So, I was the, with the situation yesterday.

Hinkes: Okay.

Griffin: But, I'm not the one that bro-, I didn't go in and break the door down, or beat the dude up.

Hinkes: Okay. So-

Griffin: Yes, I touched the guy and put my h- hand, ya know what I mean?

Hinkes: Yes.

Griffin: [Inaudible] But that was it. I left the scene.

Hinkes: Okay.

Griffin: These guys beat him up, ya know what 1 mean?

Hinkes: Okay, and are you willing to tell me who it was?

Griffin: Yes, yes, I, fuck that! I, I didn't do anything like that. [Inaudible]

**Hinkes: Okay, so do you wanna just tell me what happened, then?**

**Griffin: Yeah!** Shit, yeah, man! Fuck this!

**Hinkes: Alrighty, go ahead and tell me.**

Griffin: Alright, I can tell you the whole situation what happened.

Hinkes: Okay.

Griffin: Ya know what I mean. Ya know what I mean. If this is gonna help me, yes, I did wrong. I did wrong and my, I shouldn'ta been there, I shouldn't have, ya know what I mean? But, 1 had to do it for my daughter. Ya understand what I'm sayin'? I did it for my daughter. Yes, 1 went up there. Brian Taken Alive broke the door down.

Hinkes: Okay

7

Griffin: Went in, there's no lights there, so I, I had the phone in my hand.

Hinkes: Uh huh.

Griffin: For lights. Brian, Brian Taken Alive and Francis go in and beat the dude up.

Hinkes: Okay, so it was Brian Taken Alive, Francis Dubree?

Griffin: Dubray, yes.

Hinkes: And they were the ones that actually beat up-

Griffin: Yes, yes.

Hinkes: Okay.

Griffin: It says in my jacket, I have two jackets. The first, the top of it says, yeah, it was all me that went in there with a baseball bat. No. It was another situation that I have a jacket [inaudible] from the tribe, the [inaudible] that's the second one. That's the true one. So, [inaudible] jacket at Fort Yates that says me goin' in there with a baseball bat. Bro, I didn't have a baseball bat.

Hinkes: Okay.

Griffin: There was no baseball bat involved. Like I said, it's him. He broke the door down, he went inside the room, beat the dude up, yanked him on the floor. [Inaudible] I was gonna' cut his hair off, but I didn't cut, I couldn't. And I left the scene, and that was it.

Hinkes: Okay.

Griffin: So, and cops came to my house and arrested me first. And I did the time, too, nine months for this. The cops show up and what not, what not, and it got dropped.

Hinkes: Yeah.

Griffin: So, then Brian Taken Alive was important to me, but I still didn't snitch him out. I thought they were sayin', I thought they'd be like, oh no, ya know what I mean, keep him in jail, but he still bonded out, I don't, I don't understand that. So, that's me. Thank you.

Hinkes: Yeah, I, I

8

Griffin: Nathaniel Griffin.

Hinkes: I appreciate that you were, you were-

Defendant and Agent Hinkes continued their exchange in similar fashion. Defendant made statements or asked questions. Agent Hinkes would acknowledge defendant or ask a follow-up question to clarify what defendant stated.

There is no doubt that the defendant was in custody at the time he made the statements he seeks to suppress. The record is also clear that the defendant was orally advised of the warnings required by Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prior to making any statements. Although Agent Hinkes had a paper advice of rights form in the vehicle, he did not offer it to the defendant. There was no obligation to do so. The defendant was in custody, secured in the vehicle in shackles. There is no way the defendant could have signed an advice of rights form without being released from the restraints that kept his hands secured to the "belly band" around defendant's waist. The advice of rights was recorded as was defendant's acknowledgement that he understood and his agreement to speak with Agent Hinkes without counsel present.

"A Miranda waiver must be made voluntarily, knowingly, and intelligently. The waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Parker, 993 F.3d 595, 603 (8th Cir. 2021) (internal citation and quotations omitted). The record is clear that defendant's waiver was voluntary. Agent Hinkes did not, at any time, intimidate, coerce, or deceive defendant. In fact, Agent Hinkes repeatedly reminded that he need not talk about the offense. Defendant's nervousness, agitation, or concern about his situation did not detract from the voluntariness of his waiver. "If a suspect makes a knowing and voluntary waiver of his Fifth Amendment rights after receiving Miranda warnings, his inculpatory statements are admissible at trial." United States v. Rooney, 63 F.4th 1160, 1167 (8th Cir. 2023). "Being handcuffed in the backseat of a police vehicle does not compel a finding of involuntariness. Id. at 1169.

Defendant waived his right to have counsel present during questioning immediately after he received his advice of rights. Having done so, law enforcement was free to question him. Davis v. United States, 512 U.S. 452, 458, 114 S. Ct. 2350, 2354, 129 L. Ed. 2d 362 (1994). Agent Hinkes did not, however, proceed to question defendant. Defendant contends that he did invoke his right to counsel, citing the initial discussions he had with Agent Hinkes about being released and having counsel appointed. If a defendant does request counsel at any time during a custodial interview, the questioning must stop "until a lawyer has been made available or the suspect himself reinitiates conversation." Davis v. United States, 512 U.S. at 458, 114 S. Ct. at 2355. A defendant "must unambiguously request counsel" to invoke that right. Davis v. United States, 512 U.S. at 459, 114 S. Ct. at 2355. Defendant did not invoke the right to counsel at all. His questions regarding counsel concerned whether he would have an attorney appointed for him the following day when he appeared before a judge. At no time following his waiver did defendant give any indication that he wanted to remain silent.

Even if defendant had not waived his right to remain silent and have an attorney present during custodial questioning, or if defendant had later invoked his right to counsel, what transpired during the trip from McLaughlin to Faulkton in no way amounted to custodial interrogation. "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody." Illinois v. Perkins, 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (internal citation omitted). Custodial statements are involuntary when they are "extracted by threats, violence, or express or implied promises." United States v. Monteer, 83 F.4th 1119, 1123 (8th Cir. 2023) (quoting United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004)). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." United States v. Thunderhawk, 799 F.3d 1203, 1206 (8th Cir. 2015) (quoting Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). "There must be some coercive police activity exerted upon the defendant for the

10

defendant's statements to be involuntary, even if the defendant's mental condition is in a weakened state." United States v. Monteer, 83 F.4th at 1123.

There was no coercive conduct in this case. No interrogation occurred. In fact, what transpired cannot even be described as an interview by agent Hinkes. On the contrary, Agent Hinkes tried to prevent the defendant from making statements about the offense conduct. Agent Hinkes advised defendant of his right to remain silent and his right to have an attorney present before making any statement. Agent Hinkes reminded defendant of those rights twice during the transport. When the defendant expressed suicidal concerns, Agent Hinkes offered to listen to the defendant's concerns and once again reminded defendant that he did not need to talk at all about the offense.

Agent Hinkes in no way questioned the defendant concerning the offense conduct until the defendant himself began to relate to the officer what had transpired prior to and during the offense. Agent Hinkes' follow-up questions to clarify the co-defendants' conduct "do not amount to 'interrogation'" because the point of those questions was not to "enhance the defendant's guilt" but instead gave the defendant an opportunity to provide information that may exculpate the defendant. United States v. LaRoche, 83 F.4th 682, 689 (8th Cir. 2023).

Now, therefore,

IT IS ORDERED:

1. The objections, Doc. 87, of the defendant are overruled.

2. The magistrate's report and recommendation, Doc. 85, and transcribed bench decision, Doc. 86, are adopted.

3. The defendant's motion, Doc. 15, to suppress statements is denied.

DATED this 28th day of January, 2024.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

11